# The Balanced Budget Amendment

The lack of any enforcement mechanism in current proposals to amend the Constitution to require a balanced budget could result in the transfer of power over fundamental political questions of taxing and spending to the courts. This would represent a substantial reordering of our basic constitutional structure.

Before resorting to the drastic step of amending the Constitution, Congress should explore other reasonable alternatives, including line item veto legislation.

January 23, 1995

STATEMENT BEFORE THE JOINT ECONOMIC COMMITTEE
UNITED STATES CONGRESS

I appreciate this opportunity to present the views of the Department of Justice on proposals to amend the Constitution to require a balanced budget, including Senate Joint Resolution 1 and House Joint Resolution 1. For the most part, my comments will reflect the concerns that I raised on behalf of the Administration in testimony last year before the Senate Appropriations Committee[1] and in testimony and statements this year before the Senate Judiciary Committee[2] and the Subcommittee on the Constitution of the House Judiciary Committee.[3] I will also respond to some of the comments and suggestions made during this year's hearings in both the House and the Senate.

As I indicated in my earlier testimony and statements, the primary concern of the Department of Justice is that the proposed amendments fail to address the critical question of how they will be enforced. Were a balanced budget amendment to be enforced by the courts, it would restructure the balance of power among the branches of government and could empower unelected judges to raise taxes or cut spending — fundamental policy decisions that judges are ill-equipped to make. If the amendment proves unenforceable, it would diminish respect for the Constitution and for the rule of law.

The leading proposed balanced budget amendments all leave unanswered the central question of who will enforce the amendment — the courts or the President — or whether it is intended to be enforceable at all. Some versions of a bal-

---

[1] *Balanced Budget Amendment—S.J. Res. 41: Hearings Before the Senate Comm. on Appropriations,* 103d Cong. 131–48 (1994) (testimony and prepared statement of Assistant Attorney General Walter Dellinger) ("1994 Senate Hearings"), *see also id.* at 27–37 (testimony and prepared statement of Attorney General Janet Reno). The version of the amendment that was at issue in the 1994 Senate Hearings, S.J. Res. 41, 103d Cong. (1993) (as reported by the Senate Judiciary Committee), was identical, in all respects except the date on which it would take effect, to this year's S.J. Res. 1, 104th Cong. (1995). S.J. Res. 1 and H.J. Res. 1, 104th Cong. (1995), are described in Section 1 of this Statement.

[2] *The Balanced-Budget Amendment: Hearing on S.J. Res. 1 Before the Senate Comm. on the Judiciary,* 104th Cong. 68–79 (1996) (testimony and prepared statement of Assistant Attorney General Walter Dellinger) ("1996 Senate Hearing").

[3] *Balanced Budget Constitutional Amendment: Hearings on H.J. Res. 1 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary,* 104th Cong. 227–34 (1995) (prepared statement of Assistant Attorney General Walter Dellinger).

anced budget amendment have made efforts to restrict the authority of the courts to order remedies for violations of the amendment. However, even these versions have failed to address whether and to what extent the President would have authority to enforce the amendment through impoundment or other means, apparently deferring this question for judicial resolution.[4]

Before resorting to the drastic step of amending the Constitution, every other reasonable alternative should be explored. In addition to aggressive budget cutting measures,[5] such alternatives include line item veto legislation that has been introduced in this session of Congress. President Clinton has long supported the line item veto, and the Administration has pledged to work with Congress towards the development of an effective line item veto measure that can promptly be put into place. The line item veto legislation currently pending before Congress would increase the government's ability to reduce the deficit; unlike the balanced budget amendment proposals, however, it would do so in a manner that would not disrupt the basic structure of our government.

---

[4] In addition to the versions being debated in the House and in the Senate this year, a number of balanced budget amendment proposals have been considered by the Congress during the last 20 years. Useful discussions can be found not only in the most recent hearings, but also in: *Balanced-Budget Amendment to the Constitution: Hearing on S.J. Res. 41 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 103d Cong. (1995); *Constitutional Amendment to Balance the Budget: Hearings Before the Senate Comm. on the Budget,* 102d Cong. (1992); *The Balanced Budget Amendment Volumes I & II: Hearings Before the House Comm. on the Budget,* 102d Cong. (1992) ("1992 House Hearings"); *Proposed Constitutional Amendments to Balance the Budget: Hearings Before the Subcomm. on Economic and Commercial Law of the House Comm. on the Judiciary,* 101st Cong. (1991) ("1991 House Hearings"); *Balanced Budget Amendments: Hearing Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 101st Cong. (1990); *Balanced Budget Amendments: Hearing Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 100th Cong. (1989); *Proposed Balanced Budget Constitutional Amendments: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 100th Cong. (1989) ("1989 House Hearings"); *Balanced Budget Constitutional Amendment: Hearing on S.J. Res. 13 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 99th Cong. (1985); *Proposed Balanced Budget/Tax Limitation Constitutional Amendment: Hearings on S.J. Res. 5 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 98th Cong. (1984); *Constitutional Amendments Seeking to Balance the Budget and Limit Federal Spending: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 97th Cong. (1983) ("1983 House Hearings"); *Balanced Budget-Tax Limitation Constitutional Amendment: Hearings on S.J. Res. 9, 43 & 58 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 97th Cong. (1981); *Balancing the Budget: Hearing on S.J. Res. 58 Before the Subcomm. on the Constitution of the Senate Judiciary Comm.,* 97th Cong. (1982); *Constitutional Amendment to Balance the Federal Budget: Hearings on S.J. Res. 126 Before the Senate Comm. on the Judiciary,* 96th Cong. (1980); *Constitutional Amendments to Balance the Federal Budget: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 96th Cong. (1980) ("1980 House Hearings"); *Proposed Constitutional Amendment to Balance the Federal Budget: Hearings Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 96th Cong. (1980); *Balancing the Budget: Hearing on S.J. Res. 55 & 93 Before the Subcomm. on Constitutional Amendments of the Senate Comm. on the Judiciary,* 94th Cong. (1975).

[5] Under the Clinton Administration, the deficit is projected to decline for three consecutive years for the first time since President Truman was in office. The drop in the deficit over the last two years was the largest two-year drop in the history of the United States. The Fiscal Year 1994 deficit is more than $100 billion less than was projected prior to passage of President Clinton's economic plan.

## I. *The Leading Proposals*

I will begin by briefly summarizing the two leading proposals that I have been advised are of particular interest to your committee: Senate Joint Resolution 1 and House Joint Resolution 1.

Senate Joint Resolution 1 would propose a constitutional amendment mandating that "[t]otal outlays for any fiscal year shall not exceed total receipts for that fiscal year, unless three-fifths of the whole number of each House of Congress shall provide by law for a specific excess of outlays over receipts by a rollcall vote." S.J. Res. 1, § 1. In addition, it would require a three-fifths rollcall vote of the whole number of each House for any increase on the public debt, *id.* § 2; would require the President to submit a balanced budget prior to each fiscal year, *id.* § 3; and would require a majority rollcall vote of the whole number of each House for any bill to increase revenue, *id.* § 4. Congress would be allowed to waive these requirements "for any fiscal year in which a declaration of war is in effect . . . [or] for any fiscal year in which the United States is engaged in military conflict which causes an imminent and serious military threat to national security and is so declared by joint resolution . . . which becomes law." *Id.* § 5. Additional sections provide for implementing legislation; define receipts and outlays in broad general terms; and provide that the amendment shall take effect no earlier than 2002.

House Joint Resolution 1 would require Congress to "adopt a statement of receipts and outlays for [each] fiscal year in which total outlays are not greater than total receipts," unless three-fifths of the whole number of each House "provide in that statement for a specific excess of outlays over receipts by a vote directed solely to that subject." H.J. Res. 1, § 1. Both Congress and the President would be required to "ensure that actual outlays do not exceed the outlays set forth in such statement," which may be amended by law, "provided [that] revised outlays are not greater than revised receipts." *Id.* In addition, the amendment would require a three-fifths vote of the whole number of each House for any bill to increase receipts, *id.* § 2, or to increase the debt held by the public, *id.* § 6; would require the President to submit a budget prior to each fiscal year "consistent with the provisions of this Article," *id.* § 3; and would require that all votes taken under the amendment be rollcall votes, *id.* § 7. Congress could waive these requirements "for any fiscal year in which a declaration of war is in effect" or "for any fiscal year in which the United States faces an imminent and serious military threat to national security and is so declared by a joint resolution, adopted by a majority of the whole number of each House, which becomes law." *Id.* § 4. As with S.J. Res. 1, additional sections would provide for implementing legis-

lation; define receipts and outlays in broad general terms; and provide that the amendment shall take effect no earlier than 2002.[6]

While I have no doubt that you will wish to consider the relative merits of each of these provisions, I will not focus much further today on the differences between the two amendments. Rather, my comments will be directed to the fundamental problems stemming from the failure of either amendment to specify an enforcement mechanism.

## II. *How Would the Balanced Budget Amendment Be Enforced?*

The aspect of the proposed balanced budget amendments that is of greatest concern to the Department of Justice is that they provide no enforcement mechanism and may lead to judicial involvement in the budgetary process.[7] The Senate proposal, for example, simply declares that total outlays shall not exceed total expenditures, without explaining how this state of affairs shall come about. Mandating that Congress "shall adopt" a balanced budget will not assist Members of Congress to reach an agreement on how to balance the budget. While one Member of Congress might vote to cut military spending, another to reduce retirement or other entitlement benefits, and a third to raise taxes, each of these measures may fail to gain a majority in one or the other House of Congress. Nor could we be sure, if no majority could agree on a particular method of balancing

---

[6] Although the core structure of the two provisions is quite similar, the House proposal does differ from the Senate proposal in some significant respects, only the first of which has been the subject of much debate thus far:

    (1) H.J. Res. 1 would require that no bill to raise receipts may be passed except by three-fifths rollcall vote of the whole number of each House of Congress, rather than by majority rollcall vote of the whole number of each House of Congress.

    (2) H.J. Res. 1 seems in more explicit terms than S.J. Res. 1 to contemplate granting impoundment authority to the President, as § 1 states that the President "shall ensure" that actual spending not exceed the outlays set forth in the budget.

    (3) Even assuming that a balanced budget is passed, H.J. Res. 1 does not always require the Government to spend no more than it takes in. Rather, it requires Congress and the President to ensure that actual outlays do not exceed projected outlays. Accordingly, a deficit that results from overly optimistic projections of revenues would not violate the amendment.

    (4) H.J. Res. 1 slightly expands the class of situations in which the provisions of the amendment could be waived, authorizing waiver for "an imminent and serious military threat" even when no actual hostilities are taking place.

    (5) H.J. Res. 1 does not explicitly authorize Congress to rely on estimates in passing implementing legislation.

[7] For other expressions of concern about the enforceability of similar balanced budget amendment proposals, *see, e.g.*, 1996 Senate Hearing at 119–39 (testimony and prepared statement of David Strauss, Professor of Law, University of Chicago); *id.* at 176–89 (testimony and prepared statement of Alan Morrison, Public Citizen Litigation Group); *id.* at 133–35 (prepared statement of Cass Sunstein, Professor of Law, University of Chicago); 1994 Senate Hearings at 149–162 (testimony and prepared statement of Archibald Cox, Professor of Law, Harvard University); *id.* at 162–76 (testimony and prepared statement of former Attorney General Nicholas Katzenbach); *id* at 177–93 (testimony and prepared statement of Kathleen Sullivan, Professor of Law, Stanford University); *id.* at 193–207 (testimony and prepared statement of Burke Marshall, Professor of Law, Yale University); *id.* at 289–95 (testimony and prepared statement of Norman Ornstein, American Enterprise Institute); 1991 House Hearings at 104–06, 114 (statement of Professor Henry Monoghan,Professor of Constitutional Law, Columbia University); Letter for The Honorable Thomas F. Foley, Speaker of the House of Representatives, from Robert H. Bork (July 10, 1990), *reprinted in* Robert H. Bork, *A Seasoned Argument*, Wash. Post, June 10, 1992, at A23.

the budget, that sixty percent of both Houses of Congress could agree on an unbalanced budget. The result would be unworkable in a way that other supermajority requirements are not: while a failure to override a veto or ratify a treaty simply leaves the status quo in place, no governmental action would be authorized without a budget.

Even if Congress is able to agree on a balanced budget, or a sixty percent majority agrees to a particular unbalanced budget, the problems would not be over. If later in the fiscal year expenditures turn out to be greater than expected (perhaps because a recession increases claims on unemployment insurance), sixty percent of at least one House of the Congress may fail to agree on a resolution to exceed the spending limit, or a majority may fail to approve a change in the budget to accommodate the increase. In that situation, all members of Congress might be acting in good faith, and yet Congress would have failed to carry out its constitutional command under the amendment to ensure, in the case of S.J. Res. 1, that outlays do not exceed receipts, or, in the case of H.J. Res. 1, that actual outlays do not exceed those set forth in the budget resolution.

Should this occur, the President might well conclude that the constitutional command that "[t]otal outlays shall not exceed total receipts" — to use the language of S.J. Res. 1 for a moment — must take precedence over mere statutes, including appropriations bills, entitlement packages, and the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 601–692. Although the President might interpret that command to authorize him to impound funds,[8] nothing in the amendment guides the exercise of that power. For example, the proposal does not say whether the President may select particular areas of his choosing for impoundment, or whether certain areas — such as Social Security and other entitlement programs — would be beyond the purview of his impoundment authority.[9]

---

[8] The argument for presidential action, such as impoundment, would be even stronger under H.J. Res. 1, which requires the President to "ensure" that actual outlays do not exceed those set forth in the budget resolution However, because H.J. Res. 1 does not require that actual outlays not exceed actual revenues, any presidential enforcement authority under H.J. Res. 1 would be limited to lowering spending, and would not include the authority to increase revenues, for example by imposing fees for the use of certain government services.

[9] Attorney General William Barr has argued that S.J. Res. 1 does not provide the President with impoundment authority. 1996 Senate Hearing at 121-39 (testimony of Attorney General Barr). He reasoned that there would be no constitutional violation for the President to remedy until the last moment of the fiscal year, because of the possibility that Congress would ratify the budget imbalance by a sixty percent vote. *Id.* at 122.

While this is one way to read the amendment, it is certainly not the only one. Suppose that the President is faced with clear evidence that the budget will be far out of balance and that Congress will not reach a consensus on either a sixty percent vote or on a way to balance the budget. Suppose further that the President expresses to Congress his great concern that the Constitution will be violated and the need for congressional action, but that none is forthcoming. I am by no means convinced that the language of section 1 bars a President in these circumstances from ignoring the clear evidence that a constitutional violation is imminent and that only he can prevent it. Nothing in the amendment necessarily requires that the President wait until the last moment of the fiscal year to take action to avoid the constitutional violation (by which time such action might well be futile). Indeed, as Solicitor General Fried has suggested, section 1 may impose a *duty* on the President to impound funds to ensure that the Constitution is not violated. *See* 1994 Senate Hearings at 82 (testimony of Charles Fried, Professor of Law, Harvard University) ("I would think [the President's] claim to impound would be very strong. Not only his claim, but he could argue with considerable plausibility his duty to do so.").

Because the amendment lacks any specific mechanism for achieving a balanced budget, this amendment, once part of the Constitution, may be read to authorize, or even to mandate, judicial involvement in the budgeting process. When confronted with litigants claiming to have been harmed by the government's failure to comply with the amendment, or by impoundment undertaken by the President to enforce the amendment, courts may well feel compelled to intervene. This would be a substantial distortion of our constitutional system. If some judicial or executive enforcement mechanism is not inferred, then the amendment would constitute an empty promise in the very charter of our government. Either of these alternatives would work a fundamental alteration in the nature of our constitutional system.

## A. *Judicial Enforcement*

The proposal appears to contemplate a significant expansion of judicial authority: state and federal judges may be required to make fundamental decisions about taxing and spending in order to enforce the amendment. These are decisions that judges lack the institutional capacity to make in any remotely satisfactory manner.[10] As former Solicitor General and federal judge Robert Bork declared in opposing a balanced budget constitutional amendment:

> The result . . . would likely be hundreds, if not thousands, of lawsuits around the country, many of them on inconsistent theories and providing inconsistent results. By the time the Supreme Court straightened the whole matter out, the budget in question would be at least four years out of date and lawsuits involving the next three fiscal years would be slowly climbing toward the Supreme Court.[11]

Another distinguished former Solicitor General, Professor Charles Fried of Harvard Law School, observed in testifying against S.J. Res. 41 last February that neither the political question doctrine nor limitations on standing would nec-

---

[10] For expressions of this view, *see, e.g.,* 1996 Senate Hearing at 121–39 (testimony and prepared statements of former Attorney General William Barr); *id.* at 176–89 (testimony and prepared statement of Alan Morrison, Public Citizen Litigation Group); *id.* at 119–39 (testimony and prepared statement of David Strauss, Professor of Law, University of Chicago); *id.* at 133–35 (prepared statement of Cass Sunstein, Professor of Law, University of Chicago); 1994 Senate Hearings at 291–92 (testimony of Norman Ornstein, American Enterprise Institute); *id.* at 152–53, 156–57 (testimony and prepared statement of Archibald Cox, Professor of Law, Harvard University); *id.* at 183, 186–87 (testimony and prepared statement of Kathleen Sullivan, Professor of Law, Stanford University); 1983 House Hearings at 340–45 (testimony and prepared statement of Phillip B. Kurland, Professor of Law, University of Chicago); *id.* at 542–50 (testimony and prepared statement of Archibald Cox, Chairman, Common Cause).

[11] Robert H. Bork, *On Constitutional Economics*, Am. Ent. Inst. J. on Gov't and Soc'y 14, 18 (Sept.–Oct. 1983), *reprinted in* 1989 House Hearings at 645, 649.

essarily preclude litigation that would ensnare the judiciary in the thicket of budgetary politics.[12]

The Supreme Court has explained that "the political question doctrine . . . is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government."[13] On its face, such a statement would seem to constrain the courts' review of a balanced budget amendment. The most recent decisions of the Supreme Court, however, suggest that the Court is prepared (wisely or unwisely) to resolve questions that might once have been considered "political." For example, in *United States v. Munoz-Flores*,[14] the Court adjudicated a claim that an assessment was unconstitutional because Congress had failed to comply with the Origination Clause, which mandates that "[a]ll Bills for raising Revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1. The Court rejected the argument that this issue was a nonjusticiable political question. And in 1992, the Court held that congressional selection of a method for apportionment of congressional elections is not a "political question" and is therefore subject to judicial review.[15] Indeed, some of the legislative history surrounding previous versions of the balanced budget amendment suggests that at least limited judicial review is contemplated.[16] Accordingly, we cannot be at all sure that courts would refuse to hear claims on political question grounds.

Moreover, it is possible that courts would hold that either taxpayers or Members of Congress would have standing to adjudicate various aspects of the budget process under a balanced budget amendment.[17] Even if taxpayers and Members

---

[12] 1994 Senate Hearings at 82–83, 86–87 (testimony and prepared statement of Professor Charles Fried). Although Professor Fried concluded that the specter of judicial enforcement might be minimized by careful drafting, he nonetheless opposed the proposed amendment as "profoundly undemocratic" because it would shift power to a minority of Congress. *Id.* at 85.

[13] *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) ("Prominent on the surface of any case held to involve a political question is . . . a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government.").

[14] 495 U.S. 385 (1990).

[15] *Department of Commerce v. Montana*, 503 U.S. 442 (1992).

[16] *See, e.g.*, 140 Cong. Rec. 3026–47 (1994) (containing debate over amendment to S.J. Res. 41 limiting judicial review, indicating that Senators considered that, at least in the absence of such an amendment, judicial involvement was contemplated); 138 Cong. Rec. 17,320 (1992) (statement of Sen. Lautenberg, noting that "the sponsor of the leading proposal for a balanced budget amendment has said that if the President and the Congress could not agree on a balanced budget, a district court could enforce the amendment through a tax increase"), 1992 House Hearings, Vol. II at 461, 465–66 (statement of Rep. Stenholm, sponsor of a leading House proposal, to the effect that judicial review would be available should Congress and the President fail to meet their constitutional duties).

[17] In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court held that a taxpayer may challenge congressional action under the Taxing and Spending Clause that violates a limitation on the exercise of that power. Although later cases have narrowed the doctrine of taxpayer standing, *see, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982), the reasoning of *Flast* might well permit a taxpayer to bring suit seeking to prohibit outlays in excess of receipts, or outlays in excess of the "statement of outlays" adopted prior to the fiscal year in question, since the amendment expressly limits the congressional taxing and spending powers. Taxpayers also might challenge any increase in receipts, including the repeal of tax loopholes, where the special procedural requirements of the amendment, such as the three-fifths voting requirement of section 2, were not followed.

of Congress[18] were not granted standing, the amendment could lead to litigation by recipients whose benefits, mandated by law, were curtailed by the President in reliance upon the amendment, in the event that he determines that he is compelled to enforce the amendment by impounding funds.[19] In addition, a criminal defendant, prosecuted or sentenced under an omnibus crime bill that improved tax enforcement or authorized fines or forfeitures, could argue that the bill "increase[d] revenues" within the meaning of Section 4.[20] Surely such a defendant would have standing to challenge the failure of the Congress to enact the entire bill — not just the revenue-raising provisions — by the constitutionally required means of a majority rollcall vote of the whole number of each House of Congress. Budget bills that include enforcement provisions could prove similarly vulnerable.[21]

All told, then, the standing and political question cases decided to date do not definitively resolve whether and to what extent courts would become involved in enforcing a balanced budget amendment. In any event, the addition of the amendment to the Constitution might alter the analysis: a litigant could argue that, even if the traditional political question and standing doctrines would in the past have given courts reason to pause before they injected themselves into budget matters, the adoption of an amendment constitutionalizing budget matters now mandates judicial involvement. I cannot be confident that a court would reject such an argument, since the proposed amendment does not specifically bar judicial enforcement of its requirements.[22]

---

[18] Some have also suggested that a Member of Congress who voted against an unbalanced budget would have standing to sue to prevent its adoption. There is some case support for such a view. *See, e.g., Coleman v. Miller,* 307 U.S. 433, 438 (1939) (finding that Kansas state senators had standing to protest lack of effect of votes for ratification of proposed Child Labor Amendment, which ratification had been rescinded by subsequent act of the legislature); *Kennedy v. Sampson,* 511 F.2d 430 (D.C. Cir. 1974) (holding that legislators have standing to challenge constitutionality of pocket veto). *But see Harrington v. Bush,* 553 F.2d 190 (D.C. Cir. 1977) (holding that legislators do not have standing to challenge executive failure to act in compliance with statute). At the least, this case law suggests that there is some possibility that a court would accord legislators standing to challenge a congressional failure to comply with the terms of the balanced budget amendment, while proponents of the amendment may well be right that according legislators standing would be unwise, they cannot, in the face of these cases, confidently assert that such a view would never be adopted by the courts

[19] *See* 1994 Senate Hearings at 82 (testimony of Charles Fried, Professor of Law, Harvard University) ("[A] beneficiary of impounded funds surely could . . . enlist the aid of the courts."); *see also* 1996 Senate Hearing at 119–39 (testimony and prepared statement of David Strauss, Professor of Law, University of Chicago).

[20] The argument would be strengthened by the broad definition of "receipts" in Section 7, to include "all receipts of the United States except those derived from borrowing."

[21] A similar argument could be made on the basis of section 2 of H.J. Res. 1, which requires that a "bill to increase receipts" must be passed by three-fifths rollcall vote of the whole number of each House of Congress. A criminal defendant might argue that a crime bill that included increased resources for prosecution of income tax evasion, for example, was a "bill to increase tax revenues" within the meaning of this provision.

[22] Indeed, the Court has at times indicated that it may have a duty to become involved in cases challenging clear constitutional violations, however "political" they might appear to be. *See. e.g., United States v. Munoz-Flores,* 495 U.S. 385, 391 (1990) (rejecting claim that Origination Clause raised a political question, because "this Court has the duty to review the constitutionality of congressional enactments"); *cf. Bruneau v. Edwards,* 517 So.2d 818, 824 (La. Ct. App. 1987) (refusal of state court to stay out of question arising under balanced budget amendment on political question grounds) ("Defendants contend there exist no justiciable issues in this case because the courts should not 'step in and substitute their judgment for that of the legislative and executive branches' in the budget

ContinuedContinued

During my testimony before the Senate Judiciary Committee on January 5, 1995, Senators Brown and Simon suggested that the states' experience with balanced budget amendments did not support the argument that there is a serious risk that courts will become involved in enforcing such an amendment at the federal level. As I responded in a letter to Senator Hatch dated January 9, 1995, it appears that there has not been a significant amount of litigation in the states interpreting their balanced budget provisions, and I agree with Senators Brown and Simon that this is a factor that weighs against the argument that there would be an avalanche of litigation under a federal balanced budget amendment.

I am less certain than they, however, that the states' experience suggests we should be sanguine about the potential role of the courts in enforcing a federal balanced budget amendment.[23] While the states have not seen large numbers of suits, there have in fact been some cases in which courts have injected themselves into the state budget process. *See, e.g., Chiles v. Children A, B, C, D, E, and F*, 589 So.2d 260 (Fla. 1991) (invalidating Governor's restructuring of appropriations for failure to comply with constitutional requirements; foster children plaintiffs had standing as taxpayers); *Town of Brookline v. Governor*, 553 N.E.2d 1277 (Mass. 1990) (holding that court had power to review authority of Governor to impound funds); *Bruneau v. Edwards*, 517 So.2d 818, 824 (La. Ct. App. 1987) (affirming judicial power to review legislators' challenge to constitutionality of Governor's revision of budget); *Michigan Ass'n of Counties v. Department of Management and Budget*, 345 N.W.2d 584 (Mich. 1984) (reviewing Governor's power to reduce funds sent to local governments under a balanced budget provision in the state constitution); *Wein v. New York*, 347 N.E.2d 586 (N.Y. 1976) (finding that taxpayers had standing to seek a declaratory judgment that the issuance of anticipation notes to New York City violated the state constitutional balanced budget requirement; the court held that the state could grant the notes so long as they would be paid by the end of the fiscal year).[24]

---

process. We disagree. The determination of whether the Legislature has acted within, rather than outside, its constitutional authority must rest with the judicial branch of government.'').

[23] Nor does the experience of the states prove that balanced budget amendments always produce balanced budgets. Even proponents of the balanced budget amendment have acknowledged that almost all of the states at times fail to balance their budgets and stand in violation of their constitutions. *See, e.g.*, David Lubecky, *Comment: The Proposed Federal Balanced Budget Amendment: The Lesson from State Experience*, 55 U. Cin. L. Rev. 563, 572–73 (1986). So we cannot conclude that, while Congress and the President would feel obligated to comply with the amendment, they would always succeed in doing so. Furthermore, the states, unlike the federal government, separate their capital and operating budgets. Thus, under federal accounting rules, states would be deemed to be running unbalanced budgets. In addition, many states have been accused of using gimmicks to evade the strictures of their constitutional provisions. Finally, the states are not responsible for national defense, for most future public investment planning, or for monetary policy. As a result, the strictures that a balanced budget amendment places on the states does not interfere with the ability of the nation to set responsible public policy in these crucial areas.

[24] *See also* 1994 Senate Hearings at 86 (statement of former Solicitor General Charles Fried) (opining that, while "the greatest part of [state] litigation has dealt with the validity of debt instruments issued to supplement budgets that would otherwise have been out of balance," "[t]here is no reason to believe that litigation under a federal balanced budget would be so confined"), *id.* at 279, 283–87 (prepared statement of Louis Fisher, Congressional Research Service) (analyzing state cases), Lubecky, *supra* note 23.

In addition, there are reasons to doubt that the state experience is a good predictor of what federal courts would do. I should note one factor that would suggest that there would be less federal litigation over a balanced budget amendment than the states have experienced. Many state court systems readily accept cases that federal courts would reject as nonjusticiable and routinely issue advisory opinions. Thus, some barriers that ought to limit federal court involvement are not present in all of the states.

Other factors, however, suggest a greater potential for litigation under a federal balanced budget amendment. Compliance with the federal balanced budget amendment likely would prove more difficult than compliance with state balanced budget amendments. Since the credit markets place strong external pressures on states to balance their budgets — pressure that they do not have the power to place on the federal government — state officials have less freedom to violate constitutional balanced budget requirements. In addition, the responsibilities of the federal government over national defense and macroeconomic policy will bring compliance with the amendment up against far more powerful pressures.

The nature of the state balanced budget amendments also makes compliance easier and litigation less likely. For example, almost all of the governors have impoundment authority, a line item veto, or other powerful tools to assist them in enforcing state balanced budget requirements. While I do not mean to suggest that this makes the actual decisions on what to cut easy ones, it probably does make compliance easier by shifting much of the power to decide how to balance the budget from the legislature to the unilateral judgment of an executive officer. Furthermore, it eliminates the possibility of litigation over whether the amendment creates such authority. Finally, the states may comply with their balanced budget amendments even if they do not balance their budgets, but issue bonds to finance long-term expenditures. This distinction between capital budgets and operating budgets may have served to insulate certain questions from judicial resolution.

Thus, while the experience of the states does tend to support, as Senators Brown and Simon suggest, the argument that there would be no avalanche of litigation under such an amendment, it does not prove that judicial involvement would be limited to unusual cases, or that even a restrained judicial role would be unproblematic.

In the end, there is a range of views as to the extent to which courts would involve themselves in issues arising under the balanced budget amendment. Former Solicitor General Bork believes that there "would likely be hundreds, if not thousands, of lawsuits around the country" challenging various aspects of the amendment.[25] Similarly, Professor Archibald Cox of Harvard Law School believes that "there is a substantial chance, even a strong probability, that . . . federal courts all over the country would be drawn into its interpretation and

---

[25] Robert H. Bork, *On Constitutional Economics*, Am. Ent. Inst. J. on Gov't and Soc'y 14, 18 (Sept.–Oct. 1983), *reprinted in* 1989 House Hearings at 645, 649.

enforcement,"[26] and former Solicitor General Charles Fried has testified that "the amendment would surely precipitate us into subtle and intricate legal questions, and the litigation that would ensue would be gruesome, intrusive, and not at all edifying."[27] Other commentators, such as former Attorney General William Barr, believe that the political question and standing doctrines likely would persuade courts to intervene in relatively few situations,[28] and that there will not be an "avalanche" of litigation,[29] but that, "[w]here the judicial power can properly be invoked, it will most likely be reserved to address serious and clearcut violations."[30]

Former Attorney General Barr may well be right that courts would be reluctant to get involved in most balanced budget cases — and I agree with him that it would be proper for them to be so reluctant. However, none of the commentators, including former Attorney General Barr himself, believes that the amendment would bar courts from at least occasional intrusion into the budget process. Accordingly, whether we would face an "avalanche" of litigation or fewer cases alleging "serious and clearcut violations," there is clearly a consensus that the amendment creates the potential for the involvement of courts in issues arising under the balanced budget amendment, and that these issues are plainly inappropriate subjects for judicial resolution.[31] And, should it turn out that courts do not become involved, we would be faced with the prospect of an amendment that includes no enforcement mechanism, and of constitutional violations, including unconstitutional taxation, for which there will be no judicial remedy. As I will discuss below, this prospect also would be deeply troubling.

---

[26] 1994 Senate Hearings at 157 (prepared statement of Archibald Cox, Professor of Law, Harvard University).

[27] *Id.* at 83 (testimony of Charles Fried, Professor of Law, Harvard University).

[28] Attorney General Barr has stated that "I would be the last to say that the standing doctrine is an ironclad shield against judicial activism. The doctrine is malleable and it has been manipulated by the courts in the past." 1996 Senate Hearing at 126 (prepared statement of former Attorney General William Barr).

[29] *Id.* at 129 (prepared statement of former Attorney General William Barr).

[30] *Id.; see also* 1994 Senate Hearings at 82–83 (testimony of Charles Fried) ("I cannot be confident that the courts would treat as a political question a demand by a taxpayer or by a member of Congress that further spending in the course of that year which would unbalance the budget should be enjoined. . . . I cannot be confident that the courts would stay out of this.").

Former Attorney General Barr's acknowledgment that there may be "serious and clearcut violations" that courts could remedy appears to be inconsistent with his suggestion, discussed in footnote 9, *supra*, that there can never be a constitutional violation of section 1 of S.J. Res. 1 until the very last moment of the fiscal year, and that the President therefore would not have impoundment authority under that proposed amendment. This construction of section 1 of the amendment would appear to deprive courts of jurisdiction as well: it means that claims would be unripe until the very end of the fiscal year, when it could finally be known whether Congress would ratify a budget imbalance, but would be moot immediately thereafter.

[31] In rejecting the majority's conclusion in *Missouri v. Jenkins*, 495 U.S. 33 (1990), that a court could order a state to raise taxes, Justice Kennedy admonished: "[O]ur Federal Judiciary, by design, is not representative or responsible to the people in a political sense; it is independent. . . . It is not surprising that imposition of taxes by an authority so insulated from public communication or control can lead to deep feelings of frustration, powerlessness, and anger on the part of taxpaying citizens." 495 U.S. at 69 (Kennedy, J., concurring in part and concurring in judgment).

S.J. Res. 1 also fails to state whether federal courts would or would not be empowered to order tax increases in order to bring about compliance.[32] In *Missouri v. Jenkins*,[33] the Supreme Court held that a federal district court could mandate that a state increase taxes in order to fund a school desegregation program.[34] Once the outcome of the budgeting process has been specified in a constitutional amendment, a plaintiff with standing might successfully argue that he or she had a right to have a court issue whatever relief is necessary to remedy the constitutional violation. The failure of the amendment to preclude such powers might even be thought to suggest, in light of *Jenkins*, that the possibility deliberately was left open.

To summarize my concerns about the potential for judicial involvement, the failure to specify any enforcement mechanisms for the amendment could result in the transfer of power over fundamental political questions of taxing and spending to the courts. This would represent a substantial reordering of our basic constitutional structure. The placing of the "power over the purse" in the hands of the legislature — and not in the hands of the executive or judicial branches — was not a decision lightly made by the framers of the Constitution. James Madison wrote in the 58th *Federalist* that the "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." [35] The framers explicitly rejected the notion that such untrammeled discretion over the power of the purse should be granted to either the executive [36] or to the judiciary.[37] We should be reluctant to reconsider this basic balance of powers among the branches of government, particularly while legislative alternatives are available.

---

[32] Because section 1 of H.J. Res. 1 does not require that outlays not exceed receipts, but only that actual outlays not exceed estimated outlays, a tax increase would not eliminate the constitutional violation. Accordingly, a court would not possess authority to order a tax increase under H.J. Res. 1.

[33] 495 U.S. at 50–58.

[34] The Court held, however, that the details of how to implement that mandate must be left to state authorities. *Id.* at 51; *see also id.* at 55–56 (listing additional cases in which the Supreme Court upheld orders to local governments to "levy taxes adequate to satisfy their debt obligations" or obligations to fund desegregated school systems).

[35] *The Federalist* No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961).

[36] *See, e.g.,* 3 *Annals of Cong.* 938–39 (1793) (remarks of Rep. James Madison) (summarizing Rep. Findley as having concluded that "appropriations of money were . . . the great bulwark which our Constitution had carefully and jealously established against Executive usurpations," during the course of a congressional debate over the propriety of the President's using funds appropriated to satisfy the foreign debt for another purpose; Madison appears to have been of the view that this would be acceptable provided that a careful accounting was kept and the funds repaid to the account against which they had been drawn); *see also* 3 Joseph Story, *Commentaries on the Constitution* § 1342, at 213–14 (1833) (noting that "[i]f [the power of the purse were not placed in congressional hands], the executive would possess an unbounded power over the public purse of the nation," and that "[t]he power to control, and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation").

[37] *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (noting that the judicial branch did not pose as great a danger to liberty as opponents feared because it "has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society").

One such alternative is a statute that would grant the President the equivalent of a line item veto. President Clinton has long supported the concept of a line item veto; the Administration will work with Congress towards enactment of a statute that would confer line item veto power on the President and that would survive constitutional challenge. Toward that end, the Office of Legal Counsel has, on behalf of the Justice Department, conducted a thorough analysis of the line item veto proposals that have been introduced in this session of Congress. Those proposals are H.R. 2, 104th Cong. (1995), S. 4, 104th Cong. (1995), and S. 14, 104th Cong. (1995). H.R. 2 and S. 4 would give the President the authority to rescind discretionary budget authority after an appropriations bill has been enacted. In our view, this delegation of power to the President is constitutional.[38] S. 14 would establish expedited procedures under which Congress would consider proposed presidential rescissions of discretionary authority. We believe that this proposal is constitutional as well.

Like the balanced budget amendment, the line item veto is intended to tackle the Nation's deficit problem. But unlike the balanced budget amendment, a statute modeled on the line item veto proposals that we have reviewed would not disrupt the basic structure of our government. In contrast to the balanced budget amendment, these proposals would carefully delineate the budget-cutting authority that is to be conferred on the President. As a result, the proposals would be unlikely to lead to extensive judicial involvement in the budget process. Moreover, as legislation, a line item veto statute could be revised if it turned out to have unintended consequences.

## B. *The Prospect of an Unenforceable Amendment*

In the absence of enforcement mechanisms such as presidential impoundment of funds or judicial involvement in the budgeting process, a balanced budget amendment is unlikely to bring about a balanced budget. To have the Constitution declare that the budget shall be balanced, while providing no mechanism to make that happen, would place an empty promise in the fundamental charter of our government and lead to countless constitutional violations. Moreover, to have a provision of the Constitution routinely violated would inevitably make all other provisions of the Constitution seem far less inviolable. As Alexander Hamilton noted:

> Wise politicians will be cautious about fettering the government
> with restrictions that cannot be observed, because they know that
> every breach of the fundamental laws, though dictated by necessity,

---

[38] H.R. 2 would also authorize the President to cancel targeted tax benefits after the enactment of a revenue bill. We believe that, with minor changes that would preserve its purpose, the targeted tax benefit provision of H.R. 2 would be constitutional as well. *See* Memorandum for the Attorney General from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Line Item Veto Act* (Jan. 4, 1995).

impairs that sacred reverence which ought to be maintained in the breast of rulers towards the constitution of a country, and forms a precedent for other breaches where the same plea of necessity does not exist at all, or is less urgent and palpable.[39]

Some have suggested that even if the amendment failed to eliminate the deficit, it would nonetheless have the salutary effect of creating pressure to reduce the deficit. While this might be true, the effect would come at considerable cost. Even supposing that the amendment brought about a reduction in the size of the deficit, the remaining excess of expenditures over receipts would constitute a continuing multi-billion-dollar violation of the Constitution, every day that the budget is not in balance. For how long would we as a people continue to make difficult decisions to comply with the First Amendment or with the Due Process or Takings Clauses of the Fifth Amendment if we had routinely failed, for lack of an enforcement mechanism, to come within a billion dollars of complying with the most recent amendment to our Constitution?

## III. *Conclusion*

It would be wonderful if we could simply declare by constitutional amendment that from this day forward the air would be clean, the streets free of drugs, and the budget forever in balance. But merely saying those things in the Constitution does not make them happen. As countries around the world have discovered, placing a statement of principle in a constitution does not mean that such a principle, however laudatory, will be obeyed. Many constitutions "guarantee" environmental purity or freedom from poverty; the only effect when such promises fail is that the constitution is not taken seriously as positive law, the kind of law that is invocable in court by litigants. The framers of the American Constitution, on the contrary, understood that provisions of the Constitution must be enforceable if the rule of law is to be respected. We should hesitate long before

---

[39] *The Federalist* No. 25, at 167 (Alexander Hamilton) (Clinton Rossiter ed., 1961). For further expression of this concern, as it relates to proposed balanced budget amendments quite similar to this one, *see, e.g.*, Peter W. Rodino, *The Proposed Balanced Budget/Tax Limitation Constitutional Amendment: No Balance, No Limits*, 10 Hastings Const. L.Q. 785, 800 (1983); Letter for Warren Grimes, Counsel, House Judiciary Committee, from William Van Alstyne, Professor of Law, Duke University, *reprinted in* 1989 House Hearings at 614–15, Letter for the Honorable Peter W. Rodino, Jr., Chairman, House Judiciary Committee, from Jonathan Varrat, Professor of Law, U C.L.A., *reprinted in* 1989 House Hearings at 606–13; and 1980 House Hearings, at 22 (prepared testimony of Paul A. Samuelson, Nobel-prize-winning economist) ("If the adopted amendment provides escape valves so easy to invoke that the harm of the amendment can be avoided, the amendment degenerates into little more than a pious resolution, a rhetorical appendage to clutter up our magnificent historical Constitution. . . . There is no substitute for disciplined and informed choice by a democratic people of their basic economic policies.").

placing an unenforceable promise in the fundamental document that binds our nation together.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*